Good afternoon, Your Honors. May it please the Court, Counsel knew it was a virtual certainty that Mr. Esposito would be convicted of the brutal murder of 90-year-old Lilla Davis. Accordingly, they had two goals for sentencing. First, to gain evidence of Mr. Esposito's troubled childhood and good qualities. And second, to show that co-defendant Alicia Woodward was more culpable and may have committed the murders of Ms. Davis and the Snyders herself. How counsel fell short of those goals and why that matters are topics I would like to focus on today. Suffice it to say, however, had counsel adequately investigated, developed, and presented their chosen defenses, Mr. Esposito's jurors would have heard a dramatically different and dramatically more compelling defense, a defense that painted a vivid picture of the horrifying abuse Mr. dynamics of Mr. Esposito's relationship to his erratic, violent, and controlling mother and that illustrated how the dysfunctional dynamics of the mother-son relationship were replicated in the dominant role that the more culpable co-defendant, Alicia Woodward, played in the case. Instead, defense counsel failed to present readily available, credible evidence to support their chosen defense strategy. That failure allowed the prosecutor in closing to discredit the defense as the machinations of a manipulative conman who had conned the state of New Jersey into taking care of him for two years and was trying to con the jury into sparing his life. There is a reasonable probability that had counsel presented an adequate case, one juror hearing credible evidence of the full horror of Mr. Esposito's youth and understanding that his co-defendant was the dominant and driving force of the crimes would have voted to spare Mr. Esposito's life. I'm happy to get into the facts, but there are some questions about de novo review versus epidefference before I . . . Virtually no corroboration of Mr. Esposito's self-reporting of abuse was presented at trial. The only firsthand accounts of abuse that counsel presented was the testimony of Mr. Esposito's aunt, Althea Holt. She testified about physical abuse Mr. Esposito and his mother suffered when Mr. Esposito was a young boy at the hands of his father and his stepfather. The prosecutor made clear on cross-examination that her knowledge was limited both by the rarity of her visits with the family and the fact that she stopped visiting when Mr. Esposito was still young. The defense presented no evidence to corroborate Mr. Esposito's self-reports of physical, sexual, or verbal abuse. They did not even obtain the hospital record that showed that at the age of nine he had gone to the emergency room in North Carolina with a complaint of sexual abuse. That's pretty rare evidence to have in these cases. They did not present testimony from elementary school teachers about Mr. Esposito's precocious sexual knowledge when he was a young boy or his report of being sexually abused. They did not present evidence that Mr. Esposito suffered horrifying physical and emotional abuse inflicted by his violent and erratic mother or that like the defendant's mother in Wiggins, she had sex in front of him and otherwise exposed him. As I understand the record, and correct me if I'm wrong, there was evidence of the physical and sexual abuse, but it was, you said it's not firsthand. So explain to me the difference, the distinction that you're making. So the evidence that came in other than Mrs. Holt's testimony was that Mr. Esposito had reported to various mental health professionals that he had been sexually abused and physically abused and verbally abused in his youth. But there was no corroboration of that testimony. In the normal case, I think that in front of this Court, the people that are talking about abuse, whether fulsomely or not, are either people that have witnessed it themselves, such as the mother talking, the mother in Mr. Holsey's case, who talked about being abused by his father. When we got to federal court, the court concluded that the extra evidence, although it offered a lot more richness to that testimony, was cumulative of that testimony. In this case, the testimony was coming from people who had talked to Mr. Esposito, who was being painted by the prosecutor as a con man and not worthy of belief. So that was pretty much the focus. The focus of the closing argument was how Mr. Esposito was a con man and that the crimes are horrible. The word abuse I don't think even appears because the testimony was lacking in credibility. There was readily available evidence to show that Mr. Esposito's life was a horror. In fact, the psychologist who was appointed by the court at the prosecution's request in his report, which was not introduced at trial, testified that the horrors in Mr. Esposito's life were in fact mitigating and that they should factor into sentencing. I thought that the aunt had testified about physical abuse that he had suffered as a child. She did. She testified about abuse that she witnessed coming from Mr. Esposito's father and his stepfather, but she did not testify about any abuse that Mr. Esposito's mother inflicted upon him, nor did she have any knowledge of sexual abuse. And her knowledge of abuse pretty much stopped when Mr. Esposito was a young boy and she stopped having contact with him. And Nolan testified about both of those things, but your argument is that that testimony was not effective because Esposito was reporting to this person that those things had happened? Correct. Is that your argument? He was reporting and he was deemed and he was cast as an unreliable reporter who was just using the system to manipulate, manipulating the system to his own advantage as he was trying to do at trial. There were readily available witnesses who could have corroborated this testimony and a piece of paper from a hospital documenting that he was seen for sexual abuse when he was nine years old. Counsel ran out of time, I believe, in North Carolina because Mr. Esposito's crime happened in Georgia, but his contacts happened, existed both in North Carolina and New Jersey where he was raised. The investigator who was hired six months prior to trial after counsel had been on the case for about a year and a half made four trips and saw a flurry of, in a flurry of he completed two important tasks. One was his investigation of Alicia Woodward and the other was his investigation of Mr. Esposito's childhood which he spent roughly two days in North Carolina. He was there for four days, but he arrived late at night and didn't do any work that day and he worked for two days and then the next day did a little bit in the morning and then drove back to Georgia. As a result, counsel didn't present any evidence that corroborated their client's self-reporting which was lacking in credibility because it was easy to cast Mr. Esposito as a manipulator. And critically, counsel left their most important witness who they had flown down from New Jersey to Georgia in order to testify at the airport overnight and made no efforts to secure her testimony for trial the next day even though they knew she arrived in Georgia and that she was trying to get to the courthouse. Let me ask you about your argument about presenting relative culpability evidence. You argue that counsel made strategic decisions based on a mistaken belief about whether the second confession could come in through opening the door. But I didn't see where you identified witnesses you would have, that could have been called and what they would have said if not for that mistaken belief. Well, it's a two-fold issue because counsel said that they relied on the fear of opening the door in presenting their mitigation experts but the state habeas court relied on the same fear to discredit the claim that Mr. Esposito's lawyers should have investigated Alicia Woodward and done more than just point out that she drove the car and handled the money in order to show that she was more culpable. That goes to defective performance. What about prejudice? How do you show prejudice? So what is the testimony? Well, because the way to show prejudice is what didn't come in at trial, which was the court. And what specifically didn't come in? Because as I understand it, Mr. Esposito concedes about the polygraph that that shouldn't have come in or at least doesn't argue that. And then there were two lay witnesses who testified that they didn't think he would have done this. So what was the other evidence that you're claiming would have come in? So had counsel presented adequate evidence and done their job in this area, they would have presented testimony from people that knew Alicia Woodward and could testify to her dominant and violent and erratic character. She was very much like Mr. Esposito's mother. Heather Bryan, who was a former girlfriend of Alicia Woodward, said she was extremely possessive, violent and physically assaulted her wheelchair-bound mother who suffered from Jason Graff. Her brother backed up some of this stuff. Robert Noble was a former boyfriend. He described Alicia as being forceful, violent, unstable and dangerous. She tried to run him down with a car when he broke up with her and he had left, he left his wallet at her house and he said he was not going back there because it was easier to get a new license than to deal with her. Was there any evidence presented to the state habeas court that was actually evidence that Mr. Esposito, that she was the one who wielded the weapons? The evidence that could have been presented would have undermined his confession by showing that the tree limb, which weighed 30 pounds, could not have been the actual murder weapon, which was the state's position at the time and which is what Mr. Esposito said in his confession that came in at trial. There was no blood on the tree limb and counsel didn't even show the GPI report that tested it for blood and said that there was no blood. So there isn't positive evidence that would have exculpated Mr. Esposito, but there is evidence that would have diminished the credibility of his confession and that would have shown that Alicia Woodward was the more dominant person in this relationship and could have committed the crime. Cheryl Root, who was one of Ms. Woodward's cellmates in Colorado, could have testified that Alicia described her relationship with Mr. Esposito as one where she was the dominant person and he was submissive, very much replicating his relationship to his mother. And Mr. Esposito's former landlady could have testified that his behavior changed after meeting Alicia Woodward and that he resisted spending time with Ms. Woodward because he thought she was crazy, but that Ms. Woodward's persistence finally won him over. The evidence that could have been presented was not cumulative, as the state habeas court unreasonably found it to be. First, evidence is cumulative when it supports a fact that is established by existing evidence. But Mr. Esposito's abuse, other than through Alicia Holt, was not established by the existing evidence and is, in fact, subject of dispute. Moreover, the new evidence presented in habeas proceedings paints a vastly different picture of Mr. Esposito's background than that it was created at trial. This is not a case in which the new evidence would barely have altered the sentencing profile presented to the jury. And without corroboration, the conclusory evidence of abuse, and especially sexual abuse, was handily debunked by the prosecutor. This Court has recognized sexual abuse is particularly mitigating. I think that in Daniels v. Commissioner, the Court recognized how damaging it is because of its long-lasting effects. And they're well illustrated in this case where Mr. Esposito remains, as experts testified, he suffers from post-traumatic stress disorder symptoms, such as flashbacks, which Courtney Veach could testify to witnessing. Your Honor, were you going to say something? No.   The new evidence presented was handily debunked by the prosecutor as it was happening. And that's well reflected in the closing argument that counsel gave at trial, which reflected, I think, the amount of time that he spent addressing the mitigation that he had tried to present was four sentences, maybe it's five. You heard the witnesses today, and they were John's friends and family and psychiatrists and psychologists, rather. And there is no question that this young man has a lot of problems. Does that excuse what he did? Absolutely not. Absolutely not. There is no one here saying that that excuse is what he did. Is it a factor in mitigation? Absolutely. That's the sum total of what counsel concluded they had to work with, in large measure because they didn't allow Courtney Veach to testify, even though this young girl emptied her bank account in order to take a taxi cab from Atlanta to Milledgeville, an 80-mile journey. And it doesn't even follow the notes that counsel had intended to utilize in closing argument. This is an aggravated case, I recognize, but there are numerous cases where, with equally horrible facts, in which mitigation has proved pivotal to a finding that counsel was ineffective in failing to present it. In Williams v. Taylor, for instance, the dissent quoted the Virginia Supreme Court's discussion of the defendant who had killed the victim with a medic in order, I believe, to steal just a small quantity of money and who had previously put an elderly woman into a vegetative state. The murder of Mr. Stone was just one act in a crime spree that lasted most of Williams' life. Mr. Williams was not even a young man. Indeed, the jury heard the evidence that in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw. Nonetheless, mitigating evidence that the jury didn't hear was so powerful that it warranted sentencing relief. The same thing holds for Farrell v. Hall, which Judge Marcus, I believe you wrote, where a grandmother and a 15-year-old cousin were killed. Cooper v. Secretary, where there were also three victims, resulted in sentencing relief based on trial counsel's failure to present evidence. I believe that this Court has to engage in de novo review because there are numerous unreasonable findings of fact and law by the State Habeas Court. The Court unreasonably found that abandoning Veatch as a witness was strategic when it was exactly the opposite. It was a failure of strategy. Counsel just threw up their hands and said, I guess we can't do anything, when what they could have done was ask the judge for brief continuance, knowing that their witness was on her way from Atlanta to Milledgeville and that she had a lot of positive things to say that would have been helpful. As we discussed, they relied on a mistake of law in making strategy decisions and that mistake of law was then replicated by the State Habeas Court in finding that the failure to present evidence challenging the credibility of Mr. Esposito's confession and showing that Alicia Woodward was the more dominant and controlling and culpable party was reasonable in light of the fear of opening the door to evidence that simply wasn't admissible for those purposes. The State Habeas Court also relied on Fretwell v. Taylor. The Fretwell decision, which Williams v. Taylor held was an unreasonable application of Strickland and like the State Courts in Williams v. Taylor, the Court failed to assess the cumulative impact of mitigating evidence that would have been presented, this includes the evidence regarding lesser culpability in determining whether there was prejudice. In addition, I've identified numerous instances where the State Habeas Court was simply wrong on the facts, which I'm happy to list if the Court is interested. The sum total of evidence that the jury heard from Dr. Grant regarding the mitigation takes up less than a page of transcript. It's very conclusory. It's based solely on Mr. Esposito's reports. Dr. Grant didn't talk to any other witnesses. He didn't look at many documents because they weren't provided to him and he had very little to say as a result. The trial judge's report, in fact, didn't find any mitigation that counsel was seeking to present. The only mitigation that the Court found was that there was no significant history of prior time of the crime. He had just turned 21. He didn't find that Mr. Esposito acted under the duress of anybody or anything that was relevant to the mitigation that was the goal sentencing counsel had set for themselves. If the Court has no more questions, I'm happy to address issues that come up in rebuttal. Let me ask you a question about the deficient performance prong of your argument about the What is the best case that you think supports your arguments? Because as I look at the cases, it looks like in cases that have found that a state court's decision denying relief was unreasonable, those were only cases where there was no investigation that was performed. It looks to me like from this record, some investigation was performed. Well, in Rompilla v. Beard, there was a lot of investigation that was conducted. I don't think it matters what the subject of the investigation is, whether it's forensic evidence or mitigation evidence. Counsel engaged in a lot of investigation, but they failed to look at one critical part of investigation, which was looking at the court documents relating to aggravating evidence that was coming in at sentencing. On the basis of their failure to look at those documents, they didn't find a number of red flags that would have pointed them in directions where to go next. That's one example of a case where counsel did a fair amount without it precluding a effectiveness. I think Sears v. whatever the warden's name was at the time, also finds the same thing. I realize that that was not in habeas, but the legal issue is the same. I'm happy to keep talking, by the way, but I don't want to just babble. Give the State some time to rebuttal. Okay. Thank you. Will it get transferred over? Yes. Thank you. That's great. Thank you. Ms. Graham. Good afternoon. May it please the Court. My name is Sabrina Graham. I'm here on behalf of the warden asking that the Court affirm the District Court's denial of relief. I'd like to address, first of all, some of the questions that the Court asked first and then go into other issues. Regarding the murder weapon that was used in the Lola Davis murder, there were actually two logs that were found. There was a log that was draped over Ms. Davis that was a very large log that Ms. Witter referenced. There was also another log that was found there as well. At trial, it was testified to that the log, the smaller log, had 63 of Ms. Davis's hairs on it. The other log had, I think, approximately five or six hairs on it. I think that you asked Ms. Witter what was the evidence that they, how they investigated this particular issue. Their trial records, I mean, their billing records show that they looked at all the state's evidence. They interviewed all the states or as many of the state's witnesses as they could. They hired a DNA expert. Their theory at trial was to point out that the state had not actually tested the two logs so that there was no DNA evidence before the jury showing who actually wielded the logs. They felt like that was their better strategy. There was no testimony from trial counsel in the state habeas regarding whether or not they decided to hire a forensic expert like Dr. Arden, so the record is silent on that particular point. Going into trial counselor, I should say, the defense team's investigation of Mr. Esposito's background, Hector Guevara and his wife did a tremendous investigation of Mr. Esposito's background. They interviewed between 75 and 80 people in New Jersey and North Carolina. I realize that Ms. Witter said that they did not spend enough time in North Carolina, but I think Mr. Guevara's notes show that they interviewed at least two of the people that they brought out in state habeas. When you're looking at all of the records that Mr. Guevara obtained, he obtained all of his mental health records from Ancora Hospital to Underwood Hospital to Kennedy Hospital, the TRIS program. He got all of his high school records. He got his elementary school records. He went and talked to teacher after teacher. He would go back to the schools and back to the schools and ask to talk to the teachers. He went to the mental health hospitals and institutions that Esposito was housed in, and he sought out everybody that would talk to him. I think, in my opinion anyway, that Mr. Esposito's stronger argument is the failure to, with all of that material, the failure to present more indifferent mitigation evidence. So what's your response to that? Sure, Judge Breyer. On that one, having looked at all of the investigations that Mr. Guevara did, I think there were two main threads that you saw there. The first thread was that you had people who clearly felt bad for Mr. Esposito, and they said that he was this passive person, that he was a follower, and that he was just ruined by his mother growing up. And then the other thread of that investigation was the exact opposite, that he was violent. He was violent in school, that he was a devil worshiper, that he killed animals. And so it was a very aggravating picture that half of the people had and a mitigating picture that the other people had. And I think that trial counsel did a tremendous job in picking the witnesses that they did because they stuck to that. When they were up there, even during that cross-examination by the district attorney, they were very clear, you know, who they thought Esposito was. They did not waver in that. Regarding, I know you want to speak to the physical abuse. If you look in there, you do have a person saying they saw him getting beaten. They saw him have bruises on his body. His aunt specifically testified to that. So the jury knew that. And every single one of those witnesses say that. There's no subpoena. Did the aunt testify as to sexual abuse? I don't believe she testified to the sexual abuse. And to be honest, I do not recall anywhere in this record that anybody in state habeas testified to witnessing the sexual abuse firsthand. I only saw, and I'll be honest, I've only looked at this record for two weeks, but I that either the mother had an inappropriate relationship with him or, and that the stepdad had sexually abused him. Regarding that medical record from when he was nine years old, when he was nine, he was late to school and he told the school that he had been abducted in the woods by a man who'd forced him to perform oral sex, or the man had performed oral sex on him. And the school investigated. I think that's where that medical report comes from because all it says on that medical report is report sexual abuse. There's nothing else on it. And the school investigated it. Mr. Esposito finally said, no, I was playing with a puppy. That's why I was late for school. And then later on, he told trial counsel that he actually just hadn't done his homework and he was late for school and he made up the story. So I did not see anywhere in this record showing eyewitness corroboration of the sexual abuse, but certainly the witnesses at trial testified that they thought he was sexually abused, that he had the symptoms of someone who had been sexually abused, and they stood by that even on cross-examination. And I understand that the district attorney, you know, he, he thoroughly cross-examined all those witnesses, but there's nothing that trial counsel could have done about that because in his, all of his mental health records and in his school records, it had all of that information he could use. He was diagnosed with antisocial personality disorder. The mental health institutions noted that he was a liar. He admitted to being a liar, that he was manipulative. They, they also had information in there regarding him. I think it was hanging a cat because maybe of devil worship, I don't know. They also had information in the school records that he was violent. He had been suspended. He had an emotional problem in school. The jury heard all of that. They heard that he was in all of these institutions. They heard that he'd had this terrible life. All those witnesses testified to it except for the jailer. That was the other witness. She didn't have any firsthand or any knowledge of that. What's your response to her argument that the prosecution very effectively made the conclusion that he, you know, that he was a liar, he was a faker, and so there should have been some more direct evidence of the abuse that he suffered other than just what he had self-reported? I mean, was there such evidence that could have been presented, first of all? I think they had affidavits in state habeas regarding the physical abuse from the mother that was more eyewitness accounts of that. A lot of it was about the mother being promiscuous and the stepdad being abusive as well. But that was also testified to by the aunt. But I would go back to Cullen v. Penholster, which states that where you have a story being told to the jury, this was their theory, this kid, he was abused, and where you have put that before them, you've put the evidence before them, and you bring along more evidence of it, you can't show that counsel was ineffective. You can't show prejudice with stuff that's largely cumulative of that. That would be my response to that. Going on to the relative culpability of Alicia Woodward. There was no evidence presented in state habeas that showed that she was more culpable for this crime than Esposito. There was no evidence showing that she wielded the weapon. There's no evidence that she had confessed to anyone that she was the one that picked up the weapon and killed Ms. Davis or the Sniders. There was no physical evidence showing that she was the one that did anything. The only thing they had was testimony from people saying that she was violent and domineering, but none of those people knew her relationship with Esposito and her. They did not see them together. This was just about their relationship with her. And I'd point out that in the GBI file, they had actually gone and spoken to one of Mr. Esposito's friends, Jason Heathcote. And Mr. Heathcote said, before they left, Esposito told Alicia Woodward that he was involved with a secret group and they were after him and he was telling Alicia that to get her to leave town and go with him to out of town on this vacation. And he also said that, you know, he said he knew he killed a lot of animals. And that I don't remember if he said he was in devil worship. So there was a very mixed bag here from not only Mr. Guevara's investigation, but also from what the state had investigated regarding Alicia and Esposito. And I don't think, looking at the record, I just don't see anything in the state habeas record that shows that she was more culpable than he was. I mean, you certainly had a record here of a person who was manipulative, a liar, antisocial personality disorder. Seems like they were pretty even there. I don't know how you could show that just because she was mean and domineering that she was the one who committed the crime. And regarding trial counsel's investigation of Alicia, I'd like to point out that they did investigate her. Mr. Guevara spoke with her friends, her, some of her employers, and that information that Mr. Guevara gathered, which the state habeas court found was a competent investigation, it does not paint the same picture that has been painted here in state habeas of Alicia, of her being violent and beating her mother and things of that nature. And in fact, when Mr. Guevara talked to Heather Bryan, one of the people they got affidavits from, Ms. Bryan said she'd never seen Alicia be violent, which was stark contrast to what she said in state habeas. The state habeas trial court repeatedly relied on the fact that trial counsel was concerned that if they introduced evidence that Esposito was not the killer, that the second confession might come in through opening the door. But at the time, Supreme Court precedent made clear that the prosecutor wouldn't be able to impeach other witnesses with that information or through that, through opening the door. How then is the state habeas court's reasoning not unreasonable? If I'm, can I start off with what happened at trial there? Okay. Answer it any way you want to. To answer your question first, I did not think the state habeas court misapplied the law in any way. I think, or made an unreasonable determination of facts. At trial, before trial, I think this was pre-trial, the defense presented the trial court with an order in which it stated that, you know, they could not put in the second confession because there were two confessions and they could not put in the video confession. And the district attorney said to the judge, yes, but I can use it for impeachment. And the trial judge said to him, for the defendant. And he said, yes, for the defendant. Because under James, the U.S. Supreme Court from the 70s, you could use, if the defendant got up and testified, obviously you could use the suppressed statement. And then the DA said for rebuttal evidence, and he specifically mentioned the polygraph. And that's what it looks like to me in the record that the state wanted to get into, was to put in the polygraph and rebuttal. But didn't the court ultimately enter an order that said for impeachment or rebuttal? He did. But he also said, the trial court also said that he would revisit that issue when it came up. And it never came up. And what trial counsel testified to in state habeas, they talked about the polygraph and they said, we felt like the judge, no matter what the law was, was going to allow the videotape confession to come in if we tried to put the polygraph in. Now, they also spoke to, and I think they said something along the lines of, well, we also tried to keep our witnesses from saying anything about him not committing the crime. But that's not accurate at all because, in fact, their witnesses during the sentencing phase actually said, we think that he didn't do it, that Esposito didn't do it, that Alicia didn't do it. And they didn't present anything in state habeas showing what information regarding that that trial counsel didn't present. Their only evidence that they are saying that trial counsel didn't present was that she was violent and domineering and that. But they didn't have any other evidence to show that trial counsel didn't present it. But trial counsel didn't have that evidence to begin with. Regarding the state habeas court's order and whether or not it is entitled to deference, the only time that I noticed where it's talking about that, and I could be wrong, was when the court was deciding about Arden, who was the forensic expert, and he says that even if the court were to find that the conduct was deficient, which it doesn't, he doesn't find a reasonable probability of a different outcome, especially since the admission of the testimony would have opened the door to the videotaped confession. I don't think that that takes that outside of the realm of ADPA deference because first you have that deficiency determination. They would have to get over that. Second, it's only one of the reasons why he says that he finds a reasonable probability. The deficiency determination was based on what turned out to be a mistaken belief of counsel, right? So in other words, that deficiency determination was wrong based on the state of the law at the time. I don't think that the deficiency was, I would disagree respectfully. I think that trial counsel was never specifically asked whether or not they thought that rebuttal evidence other than the polygraph could have been used. I don't see that anywhere in their testimony. The record is silent on that particular point. So whether, you know, I just don't think that they just took— Whether or not you could impeach a polygrapher who recounts questions and answers that he got from a defendant with an otherwise inadmissible confession that the defendant had made. I'm not aware of any, Judge Marcus. And when I read the— Is there any circuit case law out answering that precise question? I do not know that. I know that the district court cited to some cases in which the courts have allowed them to put up the suppressed evidence with rebuttal evidence. But I don't know if that was polygraph evidence. Right. The reason you're not likely to find much on it is initially the polygraphers generally are not permitted to testify in most places. They could in this circuit under certain circumstances. But I was curious whether there was any Supreme Court case law or even suggestions, if not polygrapher who says, I administered these questions to this defendant. Here are the four questions I asked. Here are the four answers he gave. And in my view, he was being truthful or not, and then turn around and impeach him with what otherwise would have been an inadmissible confession. Nothing out there on that. I have not found anything on that. And I'd also like to point out in Georgia regarding the polygraph evidence, the parties can stipulate to it in sentencing phase. They don't have to stipulate to it, but the trial court still would have had to found that that was admissible evidence that it was sufficiently reliable. And in this particular case, trial counsel testified that another reason why they didn't put up the polygraph evidence was because Mr. Blackstone had something in his work history that was negative. And also in the DA's files, it showed they had consulted an expert and that expert said that the test wasn't valid. Just so that I'm clear on the record, did the trial judge ever rule, one, that the polygrapher's testimony is admissible or not? He did rule that it was admissible in the sentencing phase. And two, did he ever rule one way or the other about whether or not he would allow the otherwise inadmissible confession in to impeach the polygrapher's recitation of what the defendant had told him? No, Judge Marcus. He did not make any specific ruling. They didn't revisit that particular issue. So he said, well, let's leave it open for another time? Or did he say, no, but you can come back and revisit it? He said, what the order said was that you could use the inadmissible suppression evidence. You could use impeachment or rebuttal evidence. But he said, and that's what the order said. And then he said, but we will come back and revisit this because the trial counsel disagreed with him on that particular point. So he did preliminarily rule? Yes. And the preliminary ruling was, one, the polygrapher could come in. And two, if the polygrapher came in, then you could impeach the polygrapher with the otherwise inadmissible statement, but I'll revisit it. I don't want to, I just want to be clear on what the state trial judge did and what he told defense counsel at the time. Sure. So the issue regarding the polygrapher, I believe, was a separate order regarding the suppressed evidence. In the order for that, the suppressed, I'm sorry, the suppressed confession, the court said, I'm not going to allow this in unless for impeachment or rebuttal purposes. And that's what the order says. Right. Otherwise, if the defendant had taken the stand, there's no question that would have been admissible under Harris. But I'm asking whether he went the second step and answered the question of whether or not you could use the otherwise inadmissible confession to impeach or undermine the polygrapher's recitation of what the defendant said. He did not. When the DA brought that up, he just, he signed the order and he said, I'm going to leave the issue open. If you guys want to come back and argue. The issue being whether you could impeach a polygrapher. Correct. With an otherwise inadmissible statement. Correct. So he never ruled on it. No, Your Honor. I have to go back to Judge Pryor. Did I answer your question about the, okay. I think you did. I'd like to address the closing argument here. I understand that the closing argument was brief, but I think we all know that trial is an art form and the district attorney had given very impassioned, long closing arguments and trial counsel, part of their job is to read that room and to read those 12 jurors. They were not questioned in state habeas regarding why the closing argument was so brief. They could have looked at that jury and thought, you know, we've already told them, we've presented all of our evidence, the best evidence we had to show what kind of terrible life he had. And, you know, this is a middle Georgia jury, perhaps as counsel said to them, we're not using this as an excuse. We're just showing that it's mitigating. And maybe they thought that was the way to go, to be brief and then to beg for his life. These were very, very aggravated crimes. And in his confession that was presented in sentencing regarding the Snyders, he told the FBI agent, the one that wasn't suppressed, that he beat Ms. Snyder to death. And when he beat her, her eyeball came out and that she was still breathing and that her other eye was still open and that he could have kicked dirt in it and she would not have moved. Those were his statements. That's what the jury heard. So although information regarding his past is mitigating, and perhaps if his crime had been against his stepfather or his mother, the jury might have understood, but instead he chose to beat three elderly people to death for a little bit of money and some cars. And I don't think no matter how much evidence you put up, corroborating the fact that his was sexually abused, was it going to create a reasonable probability of a different outcome in this particular trial? Do you have any more questions? Thank you. Thank you. Ms. Witter. Thank you. I would like to start with a closing argument. Ms. Witter, if you could help me just with the question that I had asked your colleague. Was that a fair and accurate recitation of what she gave, of what the trial judge did? That is to say, he never answered the specific question of whether or not the otherwise inadmissible confession could come in to impeach the polygrapher if they chose to put the polygrapher on. In state and habeas proceedings, I believe Mr. Kelly testifies that he thought that the judge had ruled that if he presented the polygraph evidence that the state . . . Yeah, no, I understand that, but my question is not what the state of mind of the lawyer was first, but can we tell from the transcript of the trial and the orders that the judge issued, because I thought when I looked at it, the judge didn't answer that question. All he did was basically recite the law generally, the confession is inadmissible. On the other hand, if a defendant testifies, then you might be able to confront him with an otherwise inadmissible confession, which is certainly clearly established Supreme Court law, but that he never answered the additional question to it if the defendant put the polygrapher on, whether or not you could impeach the polygrapher with the inadmissible confession. And I'm attempting to answer that question. Okay. So let me back up just to say what happened at the hearing. So there was a lengthy hearing on September 11th of 1998 during which this issue came up. Counsel for Mr. Esposito came to court prepared with a brief order saying this videotaped statement is inadmissible, period. The prosecutor stood up and he said, well, Your Honor, that's just not right. It's admissible both for impeachment and for rebuttal. And the judge said, you know, I think that it's admissible for impeachment, like if the defendant takes the stand and testifies contrary to the statement, but it doesn't come in for rebuttal. Defense counsel didn't say, Your Honor, you're right. They didn't say anything and did nothing to support the trial judge's accurate recollection of the law. The prosecutor, however, persisted that Harris v. New York stated clearly that such evidence could come in both for impeachment and rebuttal. And finally, the judge said, all right, I think that you're correct. I haven't heard anything else from defense counsel. So as we proceed, if things come up, we'll address it at that time. It's true he left it open.  But he never specifically answered the . . . put the polygraph evidence in, then the videotape can come in. I'm not sure that that's accurate. And I assume that the September 11th hearing was pretty lengthy and I focused mostly on the actual ruling on the statement and didn't . . . and I don't recollect at the moment whether that was addressed. I didn't raise the polygraph issue in this case because I thought there was a much more reasonable argument to be made that a defendant's testimony by proxy would also be impeachable with a suppressed statement. In fact, the cases that the district court cited were for the purpose of impeaching medical health experts who had relied upon statements made by the defendant. Does that answer your question? Thank you. I'd like to start my part of it with closing argument. My opponent suggested that trial is an art form, but there was nothing artful about defense counsel's closing. It was the closing of somebody who had given up. And it's not true that they had presented their best evidence because they left their best evidence sitting at the airport overnight and then didn't take any steps to make sure that she could testify the next day. Courtney Veach would have been a very, very important witness. This was recognized by Mr. Guevara, who interviewed her for more time than anybody else, 10 to 12 hours. And he identified her as an important witness prior to trial. Counsel chose to have her fly from New Jersey to Georgia specifically to testify. And she gave very helpful evidence when she testified both by affidavit and in person at the state habeas hearing. Her testimony was unrebutted. She was a critically important witness who could have been the linchpin between the two different prongs of defense counsel's chosen defense because she had witnessed abuse that Mr. Esposito's mother had inflicted, had witnessed how Mr. Esposito's mother left him a cowering child in her presence. And that evidence would have segued perfectly into showing how Mr. Esposito's co-defendant, Alicia Woodward, mirrored Mr. Esposito's mother. She witnessed Mr. Esposito's mother's toxic abuse as a teenager and how it impacted him, leaving him a cowering and frightened child. And it would have enabled jurors to understand the relationship he had with Courtney, with Alicia Woodward. She witnessed Mr. Esposito's mother beating him and going after him with a baseball bat when he was a full grown or almost full grown man. He was 18 at the time. And she witnessed how Mr. Esposito's mother just screamed vicious insults to her son that left him cowering. There are other things I want to get to. So respondent has argued that there were two potential murder victims because there were two logs. One was this very large log, which was clearly what Fred Bright designated as the murder weapon, although it's hard to imagine it was a 30 pound log, how it could be wielded. And the other was a small broken off piece of wood that was probably rotting that had several hairs that a hair analyst identified as being Ms. Davis's. The idea that counsel could have done something, that counsel adequately investigated and presented evidence regarding the lack of credibility to be attributed to the confession is kind of ridiculous. The trial the DNA expert specifically testified that she could not have lifted, touched DNA from the logs and therefore could not have tested the logs for DNA. So arguing that they never tested the logs proved absolutely nothing. The respondent has also argued that the jury knew all about abuse, but they didn't. They knew that Mr. Esposito had been beaten by his father and stepfather when he was a young child on rare occasions when Althea Holt saw him. They knew nothing at all about Mr. Esposito's mother's horrific abuse of him. They knew nothing at all about the sexual abuse. And the sexual abuse in this record from the hospital, it's only a one page record. Identifying it because, and I quote from the hospital clerk, cannot locate this ER record. I hope this point, this printout of proof and diagnosis will help. That's the reason there's not documentation. It's not because Mr. Esposito didn't have a valid claim. It's because the records were lost and perhaps they would have been available at the time of trial many years before we sought to get them. Judge Joflat, you're well aware, having recently written about this, that a defendant can both malinger and be mentally ill. They're not incompatible. And so the fact that Mr. Esposito was described as being manipulative doesn't mean that he didn't have serious mental health issues. And it's very evident from the record that he did. He was really completely incapable of functioning, largely because of his mother. And with respect to the James issue, to return once more, I apologize for this, Your Honor. The state habeas court fundamentally erred. It was unreasonable for them to conclude that fear of opening the door to the suppressed statement, which was not admissible to challenge third-party testimony about other issues, was a legitimate basis to discount entirely the evidence that was presented in state habeas regarding Alicia Woodward. And that evidence was not simply that she was violent. It was also the landlady testified about seeing both of them and how Alicia Woodward negatively impacted Mr. Esposito's character. Finally, I think that the respondent was incorrect in stating that Patrick Rivera interviewed Heather Bryan and that she gave conflicting testimony. I believe that she was interviewed by a state investigator during the pretrial investigation by phone. And as she explains in her affidavit that was submitted in state habeas, she's hard of hearing and she would never have said that Alicia Woodward was not violent. She couldn't hear the question and that the answer that was given was misleading as a result. If the Court has no questions, I'd like to conclude. Strickland recognizes that there may be many ways that counsel can provide constitutionally adequate representation. But with the critical caveat that counsel's choices must be reasonably guided by their fundamental duty to advocate on their client's behalf. In Mr. Esposito's case, his attorneys merely went through the motions of representing him without actually investing the time, thought, and energy needed to present a credible and compelling defense. This despite the ready availability of evidence needed to do so. Their failure amounted to a breakdown in the adversarial process that both Strickland and to grant sentencing relief.